IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | **UNDER SEAL** |
| v. | |
| JORGE FIGUEIRA, | No. 1:25-MJ-730 |
| *Defendant* | |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Stephen A. Walker, being duly sworn, depose and state the following:

**INTRODUCTION**

1.      This affidavit is submitted in support of a criminal complaint and arrest warrant for

Jorge Figueira ("**FIGUEIRA**"). Based on the information set forth in this Affidavit, I submit there

is probable cause to believe that from at least January 2024 up to and including November 2025,

in the Eastern District of Virginia and elsewhere, **FIGUEIRA** conspired with others known and

unknown to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) (Conspiracy to

Launder Monetary Instruments), and conducted financial transactions to conceal or disguise the

nature, location, source, ownership, or control of property represented to be the proceeds of

specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) (Concealment Money

Laundering) and 1956(a)(3)(B) (Sting Money Laundering).

2.      Since 2021, I have been employed as a Special Agent with the Federal Bureau of

Investigation (FBI).  In this role, I have been assigned to teams within the FBI that are responsible

1

for the investigation of transnational criminal organizations, including drug-trafficking and money-laundering organizations. Prior to my employment with the FBI, I was employed in local law enforcement within the State of North Carolina for more than 10 years.

3.  Based on this and other investigations, coupled with information from other law enforcement agents, as well as my training and experience, I am aware that:

    a.  International drug trafficking is fundamentally based upon logistics, whereby drug traffickers move drugs from areas of high supply and low resale value (such as parts of Central and South America) to areas of lower supply and higher resale value (such as the United States and Europe). Once drugs are sold, traffickers need to move large amounts of drug proceeds back to the source countries;

    b.  International drug trafficking is lucrative, and drug trafficking organizations employ a myriad of methods to launder the proceeds from the sale of drugs. Due to the large quantities of cash that drug traffickers possess from drug transactions, drug traffickers commonly seek to conceal and launder the illicit proceeds of their activity through the use of both illegal and legal business enterprises and also rely upon complex money laundering networks to assist them in this task;

    c.  International drug trafficking generates large volumes of bulk cash which is difficult to convert and/or physically transport covertly. One of the primary methods that international drug traffickers use to convert and move the value of these foreign currencies back to a home or drug-source country is to use money launderers. For a fee, these individuals specialize in picking up and

placing the bulk cash into the banking system in coordination with other individuals. The money launderers can also move the value of the drug proceeds through the international financial system at the direction of drug trafficking clients;

d.  The cryptocurrency ecosystem is often used by money launderers to receive money, and to launder it quickly, anonymously, and at scale. Cryptocurrency "wallets" are often unattributable, simple to create, and can accept large transaction amounts without additional scrutiny;

e.  A series of convoluted transactions and quick swaps between financial accounts, whether traditional bank accounts or cryptocurrency wallets, is a strong indication that the movement of funds was performed in a manner meant to conceal the nature, source, controlled, and/or ownership of the proceeds of a specified unlawful activity;

f.  Shell companies, which are business entities with no significant assets or operations, are sometimes used in the money laundering context because their lack of real business operations and deliberately complex structures provide for a veil of secrecy, allowing criminals to obscure the illegal origin of their funds.

4.    This Affidavit does not contain every fact known to me or the government regarding this investigation but rather contains only information necessary to demonstrate probable cause in support of a criminal complaint and arrest warrant. All information contained in this Affidavit is either personally known to me, has been related to me by other law enforcement

officers, or has been related to me by reports, records, and documents gathered during this investigation.

5.      The communications described in this Affidavit were largely conducted in Spanish. The verbal communications, including the telephone calls and in-person meetings described below, were audio recorded. The recordings of the verbal communications have been translated from Spanish to English by FBI employees with Spanish-language skills.

## RELEVANT STATUTES

6.      Under 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in §§ 1956 or 1957. A violation of § 1956(h) is subject to the same penalties as the offense which was the object of the conspiracy.

7.      Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for any person, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, to conduct, or attempt to conduct, such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

8.      Under 18 U.S.C. § 1956(a)(3)(B), it is unlawful for any person, with the intent to conceal or disguise the nature, location, source, ownership or control of property believed to be the proceeds of specified unlawful activity, to conduct, or attempt to conduct, a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity. The term "represented" means any representation made by a law enforcement officer or by another person at law enforcement's direction and with law enforcement's approval.

4

9.      Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), the manufacture, sale, or distribution of controlled substances constitute "specified unlawful activity" for purposes of § 1956. Under 18 U.S.C. § 1956(c)(7)(A) and 1961(1)(B), the trafficking of goods or services bearing counterfeit marks also constitutes "specified unlawful activity" for purposes of § 1956.

## SUMMARY OF PROBABLE CAUSE

### *Background*

10.      As part of the investigation, the FBI recruited three confidential sources ("CS-1," "CS-2," and "CS-3," respectively). CS-1[1] is based in Panama City, Panama, but has traveled to Miami, Florida during the course of the investigation. CS-2[2] was based in Miami, Florida. CS-3[3] is based in Virginia. At law enforcement's direction, CS-1, CS-2, and CS-3 have represented themselves to be individuals involved in drug trafficking and counterfeit merchandise, as further described below.

### *CS-1 Meets with UCC-1: October 2023 and January 2024*

11.      CS-1 identified an unindicted co-conspirator ("UCC-1") as a major international money launderer based in Panama and Venezuela. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") has designated members of UCC-1's family as "Specially Designated Narcotics Traffickers" and has recognized that UCC-1's family and

---

[1] CS-1 has no criminal record. CS-1 has assisted law enforcement and hopes to receive a U.S. tourist visa. CS-1 has not been known to provide law enforcement with false information, and law enforcement has independently corroborated information provided by CS-1.

[2] CS-2 has a prior conviction for conspiracy to possess with intent to distribute cocaine. CS-2 has received monetary compensation for their work with law enforcement. CS-2 has not been known to provide law enforcement with false information, and law enforcement has independently corroborated information provided by CS-2. CS-2 has since relocate to Colombia.

[3] CS-3 has a prior 2007 conviction for a felony narcotics trafficking offense. He entered a cooperation plea agreement and was released from prison to proactively assist law enforcement with criminal investigations. After assisting with several investigations, CS-3 was given a sentence of time served. CS-3 has continued to proactively assist law enforcement in exchange for money and immigration benefits. CS-3 has admitted to using a fraudulent birth certificate to apply for a U.S. driver's license and U.S. passport. CS-3 admitted this conduct, which was disclosed to the court as part of CS-3's sentencing for his 2007 conviction.

associates use money laundering methods to launder drug proceeds on behalf of multiple international drug traffickers and their organizations.

12.     At law enforcement's direction, CS-1 began exchanging messages via WhatsApp with UCC-1 regarding UCC-1's ability to transfer large sums of money. UCC-1 added CS-1 to a WhatsApp group conversation, titled "(USTD) TRANSF OSO." In my training and experience, I know that "USTD" is a reference to USDT (Tether), a type of cryptocurrency referred to as a "stablecoin" because its value does not fluctuate like other types of cryptocurrencies. Instead, USDT is traded at a 1:1 ratio to the value of the U.S. dollar. I also know that USDT is commonly used by individuals engaged in organized criminal activity, such as money laundering, because it is tied (or "tethered") to the value of the U.S. dollar, making its value more reliable.

13.     On or about October 2, 2023, CS-1 and UCC-1 met in person in Panama City, Panama. CS-1 informed UCC-1 that CS-1 needed to transfer money from Panama to the United States. UCC-1 stated that UCC-1 was capable of transferring money to the United States.  CS-1 stated that CS-1 needed money to be "cleaned." UCC-1 replied: "I can clean it up for you easily because they come out of my account... If they have a clean account where the money comes in... What they are going to do is grab the cash and deposit it in the account, and I will send it to you via a legal transfer." UCC-1 agreed to receive cash in Panama and to transfer the money to the United States. UCC-1 and CS-1 agreed that CS-1 would pay a 3.5% fee for the transfer. In my training and experience, I know that "cleaning" money refers to laundering bulk cash generated from unlawful activity, such as drug trafficking. I also understand that when UCC-1 told CS-1 that UCC-1 would return cash to CS-1 "via a legal transfer," UCC-1 meant that UCC-1 would send the funds to CS-1 via traditional banking means, such as a wire transfer, despite the funds being generated by unlawful activity.

14.     During the conversation, UCC-1 stated that UCC-1 had a license to take out $250 million per day because UCC-1 operated like a bank. UCC-1 further informed CS-1 that UCC-1's license allows UCC-1 to use banks to exchange USDT for U.S. currency. UCC-1 told CS-1 that UCC-1 could easily move "70 or 80" per day. Based on my training and experience, my conversations with CS-1, and the subsequent transactions that occurred, I believe "70 or 80" refers to $70,000 or $80,000 per day. UCC-1 told CS-1 that UCC-1 is worth approximately $200,000,000 and is one of the ten most powerful people in Venezuela.

15.     A few months later, on or about January 2, 2024, CS-1 and UCC-1 spoke by phone regarding an upcoming money transfer. CS-1 asked UCC-1 if UCC-1 would "launder" CS-1's money. In response, UCC-1 stated that "launder" is an ugly term. UCC-1 stated that CS-1 could provide UCC-1 money that is proceeds from anything and that UCC-1 was simply offering CS-1 a "service." CS-1 agreed to use the term "service" going forward. In my training and experience, I know that individuals engaged in organized criminal activity, such as money launderers and / or drug traffickers, often use terms such as "service" or "product" to refer to their illegal activities in an attempt to avoid law enforcement detection.

16.     During this same conversation, CS-1 and UCC-1 discussed how CS-1's money would be transferred from Panama to the United States. UCC-1 instructed CS-1 to take the money to an associate of UCC-1 – namely, UCC-2. UCC-1 stated that UCC-1 would then transfer the money to CS-1's account within the same day in exchange for a 3.5% fee.

*Controlled Transaction #1: January 23, 2024*
*$20,000 in U.S. Currency Dropped in Colón, Panama*

17.     On or about January 23, 2024, CS-1 met with UCC-2 at UCC-2's place of business in Colón, Panama. CS-1 provided $20,000 in U.S. currency to UCC-2. UCC-2 then designated a third individual to count the cash through a money counter. While CS-1 and UCC-2 were alone,

UCC-2 stated that UCC-1 could move $1,000,000 without issues, and further stated that UCC-1 moves more than $20,000,000.

18.    Later that day, CS-1 had a brief confirmatory phone conversation with UCC-1 in which UCC-1 confirmed that UCC-2 had received the cash, that CS-1 would receive the money in CS-1's account as agreed, and that proof of payment would be provided. CS-1 subsequently received a text message within the same group conversation on WhatsApp titled "(USTD) TRANSF OSO," which confirmed that the transaction had occurred. A screenshot of the WhatsApp conversation is depicted below:

Translation



| My Sir | |
|---|---|
| | Hello |
| Good afternoon | |
| Received 20k | |
| Discount 3.5% | |
| And transfer to this account [*Sends prior message with information Wells Fargo bank account information.*] | |
| | Please send me proof here. Thank you. |

19.    Later that day, as expected, $19,300 arrived in the bank account that CS-1 had provided to UCC-1 and UCC-1's co-conspirators. Unbeknownst to the co-conspirators, this bank account was controlled by the FBI. The $19,300 deposited into the bank account accurately reflects the $20,000 in cash that CS-1 handed over in Colón, Panama, minus the agreed upon 3.5%

commission (totaling $700). The transfer that arrived in the FBI-controlled bank account was sent from an entity owned and operated by **FIGUEIRA** (hereinafter "**COMPANY A**"). **COMPANY A** has a physical office location in Sunny Isles Beach, Florida. A screenshot of the transfer confirmation is depicted below:



20.     Unindicted Co-Conspirator 3 ("UCC-3") is based in Venezuela. UCC-3 has been identified by law enforcement as an associate of both UCC-1 and of **FIGUEIRA,** described in more detail below.

21.     The FBI executed a search warrant (1:24-SW-694 – Under Seal – Eastern District of Virginia) on an iCloud account associated with UCC-3. In UCC-3's iCloud account, the FBI located spreadsheets with information that tracked various financial transactions. An entry in these spreadsheets noted that, on January 24, 2024, $19,300 was sent to the FBI-controlled back account.

*Controlled Transaction #2: February 28, 2024*
*$70,000 in U.S. Currency Dropped in Colón, Panama*

22.    In February 2024, CS-1 again contacted UCC-1 regarding a second money transfer. UCC-1 again instructed CS-1 to contact UCC-2.

23.    On or about February 28, 2024, CS-1 returned to UCC-2's place of business in Colón, Panama. UCC-2 was not present; CS-1 instead met with another individual who was inside the associate's business. This individual led CS-1 inside of an office and locked the door behind them. The windows in the office were painted black, and CS-1 was not allowed to take his cellphone out of his pocket during the transaction. The individual confirmed that he had worked with – and was close friends with – UCC-1.

24.    CS-1 handed $70,000 in U.S. currency to this individual, who then counted the cash through a money counter multiple times. After the individual confirmed the quantity of cash, CS-1 called UCC-1 to confirm the transaction. The individual also spoke to UCC-1 on the phone and stated: "I'm confirming the 70." UCC-1 responded: "Okay, understood."

25.    Later that day, CS-1 received a text message within the same WhatsApp group conversation titled "(USTD) TRANSF OSO" that confirmed that the transaction had occurred. This text message came from the same phone number that sent the confirmatory text message that followed the first controlled transaction. A screenshot of the group conversation is depicted below:



Translation

| | |
|---|---|
| | Transfer amount: $67,550.00 |
| | Delivered: $70,000.00 |
| Good afternoon | |
| | Good afternoon |
| In process | |
| [*Sends confirmation, which notes money was wired from COMPANY A in the amount of $67,550.*] | |
| | Thank you. |

26.     Later that day, as expected, $67,550 arrived in the FBI-controlled bank account that CS-1 had provided to the co-conspirators. The $67,550 deposited into the bank account accurately reflects the $70,000 in cash that CS-1 handed over in Colón, Panama, minus the agreed upon 3.5% commission (totaling $2,450). The transfer that arrived in the FBI-controlled bank account was sent from **COMPANY A**. As stated above, **COMPANY A** is owned and operated by **FIGUEIRA**. A screenshot of the wire transfer confirmation is depicted below:

11



*CS-1 Coordinates Next Controlled Transaction with UCC-1: March 2024*

27.     In March 2024, following the second controlled transaction, CS-1 exchanged text messages via WhatsApp with UCC-1. CS-1 asked UCC-1 if UCC-1 could receive and transfer money within the United States. CS-1 explained to UCC-1 that CS-1 worked in counterfeit merchandise[4] and needed someone to pick up cash in the United States and transfer it to CS-1's supplier's account. Initially, UCC-1 stated that UCC-1 did not have anyone who could receive cash in the United States; subsequently, however, UCC-1 stated that UCC-1 would look for someone who could receive CS-1's cash in the United States.  UCC-1 directed CS-1 to contact the same WhatsApp group conversation, titled "(USTD) TRANSF OSO," that CS-1 had

---

[4] As stated above, under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), the trafficking of goods or services bearing counterfeit marks constitutes "specified unlawful activity" for purposes of 18 U.S.C. § 1956.

communicated with regarding the first and second controlled transactions to arrange for the delivery of cash. A screenshot of CS-1's conversation with UCC-1 is depicted below:



Translation

| What else brother | |
| Greetings | |
| And blessings | |
| Indicate | |
| | Greetings |
| | I'm negotiating a shitload of counterfeit branded wallets and I need to give you cash and you transfer it to the supplier's account. |
| | Do you have someone who received in [American flag emoji]? |
| No brother | |
| | I need you to help me with a partner who can make that trip for me. |
| | Can you recommend someone to me? |
| | Any trusted friend who can help me with this business I don't want to miss the opportunity |
| Where is it? | |

28.     CS-1 then contacted the (USTD) TRANSF OSO group conversation on WhatsApp. CS-1 and the members of the group conversation negotiated the terms of exchange, namely that the members would receive $50,000 in U.S. currency and charge CS-1 a 10% commission fee. Based on my training, experience, and knowledge of this investigation, I understand that this commission fee was higher than the prior two fees (3.5% each) likely because the money was picked up in the United States. CS-1 also received from the members of the group conversation a serial number from a U.S. currency note, which served as a token or passcode for the two parties

13

exchanging the bulk U.S. currency. Based on my training and experience, I know that this is a common technique employed by money laundering organizations to verify that people conducting business are trusted by the network. A token also typically serves as a confirmation number, or receipt, for the transaction. The transaction is recorded with the token number so that the transaction can be referenced later if needed. CS-1 informed the members of the group conversation that the money was ready to be picked up in Miami, Florida. The members provided CS-1 a U.S. telephone number to contact. A screenshot of the group conversation is depicted below:



Translation

| And then not respond? | |
|---|---|
| | It's happening hbb calm down |
| | I'm just waiting for my merchandise to be ready so I can give you the money and for you to make the payment. Relax, it's fine. I trust you a lot, that's why I only work with you and no one else. |
| [*Sends phone number*] | |
| [*Sends image of serial number on U.S. currency note*] | |

29.    Subsequently, CS-2 who, as stated above, was based in Miami, Florida, contacted the U.S. telephone number provided to CS-1. CS-2 and the user of the U.S. telephone number coordinated the time and location of the delivery of the $50,000 in U.S. currency. At the direction

of the members of the WhatsApp group conversation, CS-2 completed a form with information regarding the requested money transfer. In the form, CS-2 noted that the beneficiary of the transferred funds was located in Alexandria, Virginia, within the Eastern District of Virginia.



Translation

|  | Form to process domestic transfers (within the USA) |
|---|---|
|  | Name of Bank: United Bank |
|  | Routing Number: [Redacted] |
|  | Name of Beneficiary (as registered with the bank): [Redacted] |
|  | Beneficiary account number: [Redacted] |
|  | Bank Address: [Redacted] Parkersburg, West Virginia |
|  | Beneficiary Address: [Redacted] Alexandria, Virginia |
| But they haven't returned it? |  |
| To the account |  |

*Controlled Transaction #3: May 7, 2024*
*$50,000 in U.S. Currency Dropped in Miami, Florida*

30.    On May 7, 2024, CS-2 met with another individual at the time and location in Miami, Florida, previously agreed upon. This individual arrived in a burgundy SUV, briefly exited the vehicle, and interacted with CS-2. CS-2 provided this individual with the $50,000 in U.S.

currency; in exchange, this individual provided CS-2 with a U.S. currency note. The serial number

on the U.S. currency note matched that of the token previously provided to CS-1.

31.    Later that day, CS-1 received a text message within the same WhatsApp group

conversation titled "(USTD)TRANSF OSO," which confirmed that the transaction had occurred.

A screenshot of the group conversation is depicted below:



| | Translation |
|---|---|
| | They let me know that they received everything fine and they let me know about the transport |
| [*Sends confirmation, which notes money was wired from COMPANY B in the amount of $45,000*] | |
| | Thanks Manito |

32.    On or about May 10, 2024, as expected, $45,000 arrived in the FBI-controlled bank

account that CS-1 had previously provided to the co-conspirators. The $45,000 deposited into the

bank account accurately reflects the $50,000 in cash that CS-2 handed over in Miami, Florida,

minus the agreed upon 10% commission (totaling $5,000). The transfer that arrived in the FBI-

controlled bank account was sent from another entity that the investigation revealed is owned an

operated by **FIGUEIRA** (hereinafter "**COMPANY B**"). A screenshot of the transaction confirmation is below:



33.     As stated above, the FBI executed a search warrant (1:24-SW-694 – Under Seal – Eastern District of Virginia) on an iCloud account associated with UCC-3. In UCC-3's iCloud account, the FBI located a copy of the confirmation of the $45,000 payment that was sent to CS-1.

34.     I have reviewed records from financial institutions related to **COMPANY B**. The financial records similarly showed that, on May 10, 2024, a $5,000 deposit was sent from **COMPANY B** to UCC-1. This $5,000 deposit corresponds to the 10% commission described above.

*CS-1 Connects with **FIGUEIRA**: August 2024*

35.    CS-1 continued to try to contact UCC-1 to conduct further transactions, but UCC-1 stopped responding to CS-1. Law enforcement subsequently learned that UCC-1 was incarcerated in Venezuela following the 2024 Venezuelan presidential elections. As of the writing of this affidavit, to the best of my knowledge, UCC-1 remains incarcerated in Venezuela.

36.    On or about August 27, 2024, CS-1 visited the physical office location of **COMPANY A** in Sunny Isles Beach, Florida. CS-1 spoke with a receptionist who then connected CS-1 by telephone to **FIGUEIRA**.

37.    CS-1 and **FIGUEIRA** spoke by phone. CS-1 told **FIGUEIRA** that CS-1 needed to do monetary transactions but had been unable to contact UCC-1. CS-1 noted that, when the funds from the money transfers conducted with UCC-1 were previously sent to CS-1, they came from **COMPANY A**. As a result, CS-1 decided to come to **COMPANY A's** office in Sunny Isles Beach, Florida in person to try to conduct further tractions. CS-1 stated that he was leaving the United States for a period but would return a few weeks later.

38.    That same day, UCC-3 contacted CS-1 via WhatsApp. UCC-3 introduced himself as an associate of UCC-1, and asked how UCC-3 could help CS-1. In a subsequent phone call via WhatsApp, CS-1 explained to UCC-3 that CS-1 worked in counterfeit merchandise. The two discussed the possibility of UCC-3 helping to coordinate the delivery of cash in Miami, Florida and then then transferring the money to an account.

39.    In a second phone call, UCC-3 explained that UCC-3 was an associate of both UCC-1 and **FIGUEIRA**, but that UCC-1 and **FIGUEIRA** did not personally know each other. CS-1 told UCC-3 that the money to be transferred was "sucio" (meaning "dirty"). UCC-3 acknowledged this and stated that he was simply providing a service to CS-1.

*CS-1 and **FIGUEIRA** Meet in Person in Sunny Isles Beach, Florida: September 2024*

40.     On or about September 27, 2024, CS-1 and **FIGUEIRA** met in person at **FIGUEIRA**'s office associated with **COMPANY A**, located in Sunny Isles Beach, Florida.

41.     During the conversation, CS-1 explained that CS-1 initially worked with UCC-1, and that UCC-1 was an associate of UCC-3. **FIGUEIRA** replied that UCC-3 was a "good acquaintance" of **FIGUEIRA**'s and that UCC-3 and UCC-3's clients are welcome at **FIGUEIRA**'s companies.  **FIGUEIRA** recalled that **FIGUEIRA** had done a payment for UCC-1. CS-1 explained that when CS-1 was working with UCC-1, CS-1 had received "two or three payments" from **FIGUEIRA**, which is why CS-1 contacted **FIGUEIRA** when CS-1 was no longer able to contact UCC-1.

42.     CS-1 stated that CS-1 had cash in Miami that CS-1 needed to put into the U.S. banking system. **FIGUEIRA** stated that **FIGUEIRA** could not accept cash in the United States. **FIGUEIRA** explained that UCC-3 could receive cash in Venezuela, and **FIGUEIRA** could then convert cash into USDT. **FIGUEIRA** would then send the USDT to liquidity providers who would exchange USDT to U.S. dollars, and then send those dollars to **FIGUEIRA**'s various bank accounts. Once the U.S. dollars arrived in **FIGUEIRA**'s bank account, **FIGUEIRA** could pay CS-1.  **FIGUEIRA** stated that, in the United States, this process must be done "very discretely, because you know that this can't be… in this country, you know… that's why we are so careful. It's better if you don't mention it around."

43.     **FIGUEIRA** stated that he had another company (hereinafter "**COMPANY C**") and was trying to open an account for **COMPANY C** in Panama. **FIGUEIRA** stated: "I can't go and tell them that I am a money transmitter because they would close the doors for me immediately.

So, I tell them that we are a credit company… that is what we do publicly, we are a credit company. We can't say that we do a front of money, we do remittances."

44.    **FIGUEIRA** asked CS-1 where **FIGUEIRA** should send the money. CS-1 stated that CS-1 has two or three companies to which CS-1 typically sent payment to in the United States, and that CS-1 typically sent $30,000 to $50,000 to these companies on weekly basis. **FIGUEIRA** stated that amount of money was very manageable. **FIGUEIRA** further stated that he and his associates manage an average of $700,000,000 in transfers per month to locations all across the world, including Argentina, Colombia, Spain, Dubai, China, Germany, as well as domestically. **FIGUEIRA** further stated that he could move $100,000,000 in one transfer, and that he had a "wallet" that he believed would reach $1,000,000,000 in value next year. In my training and experience, I believe that when **FIGUEIRA** referred to his "wallet," he was referring to a cryptocurrency wallet.

### *CS-1 Speaks by Phone with **FIGUEIRA**: November 2024*

45.    A few weeks later, on or about November 14, 2024, CS-1, who had returned to Panama City, Panama, and **FIGUEIRA**, who remained in Florida, spoke by phone. During the phone conversation, **FIGUEIRA** explained that **FIGUEIRA** uses USDT and that he and his associates screen the cryptocurrency wallets they work with to make sure the wallets do not have any legal issues such that they might get frozen. **FIGUEIRA** stated: "I don't want to have issues with anybody, especially the federal authorities."

46.    Later during the phone conversation, **FIGUEIRA** explained his process to CS-1. **FIGUEIRA** stated: "Let's give you an example. You give me one million USDTs because you want me to transfer one million dollars to an account in the Bank of America…. Well, I already have them in my wallet… I will send them to the OTC who is my liquidity provider… I use bigger

ones like Enigma, Anchorage, Abra, etcetera. They immediately exchange those USDT to dollars into a bank account that is mine. But that has a cost, they charge me, that cost is related to the market. Based on those costs, I would give you a fee." **FIGUEIRA** further explained that the fee changes based on the market, and may be in the range, for example, of about 1.5%. **FIGUEIRA** continued: "So I subtract that 1.5% from that one million and I send you the difference to your bank account… In that example, I am going to send you $985,000 back." **FIGUEIRA** stated that a domestic transfer would probably go through in the same day, and an international transfer would probably take a couple of days to arrive.

47.     **FIGUEIRA** continued to explain the benefits of working with USDT. **FIGUEIRA** stated: "Basically, it is used for what we are doing. It is used to transfer money in a quick way, even to make it get to jurisdictions that have some type of issues, etcetera. For example, to send it to China. It is not that easy to pay in China. Or, let's say it because I'm from there, to bring resources from Venezuela, and to pay different accounts not only in the United States but also in other parts of Europe and Asia, through USDT, because Venezuela doesn't have the liberty to interact with the international financial institutions because of the sanctions."

48.     **FIGUEIRA** continued: "Let me be clear with you, [USDT] is used a lot for laundering money. So, of course, we have to be very careful about that … In this country where I live… there are two very important laws, the PATRIOT law and the RICO law. Both say that if you are collaborating either directly or indirectly in a money laundering operation, the minimum sentence is 20 years of prison."[5]

49.     **FIGUEIRA** explained that he does not accept cash deposits in the United States because the origin can be questioned. However, **FIGUEIRA** further explained, "it is not like that

---

[5] A conviction for a federal money laundering offense can result in a maximum (not minimum) sentence of up to 20 years imprisonment.

in Venezuela. In Venezuela, everything gets mixed. All those dollars coming from commerce that the government of Chavez has caused all those transactions to be done in cash for different reasons, get mixed with all those dollars in cash that have questionable origin. But, well, that's what the USDT is made for, to collaborate with the cleaning of all of that stuff. I think I told you something that I shouldn't have told you, but a lot is made for that. That's why I insist a lot about the screening of the wallets."

50.    **FIGUEIRA** stated that he is careful to not participate in money transactions that could be called into question. **FIGUEIRA** stated: "I am very careful with that because the feds quietly investigate everything. You could think that nothing is happening because the transactions are going through without any issues, but what happens is that a federal agent has been for a long time creating a file and they are letting those transactions happen so they can accumulate evidence that you are doing something illegal."

*Controlled Transaction #4: November 21, 2024*
*$20,000 Transferred via USDT*

51.    Approximately one week later, on or about November 20, 2024, CS-1 and **FIGUEIRA** again spoke by phone. CS-1 and **FIGUEIRA** agreed to conduct a transaction for $20,000 using USDT. **FIGUEIRA** stated that the current commission fee was 0.55%. Based on my training and experience, I know that a commission of less than 1% is what is typically seen for cryptocurrency transactions. **FIGUEIRA** further stated that he would charge an additional fee of $15 for the deposit and $40 to cover the charge from the bank. **FIGUEIRA** said that **FIGUEIRA** would send CS-1 a total of $19,800.

52.    CS-1 subsequently contacted **FIGUEIRA** via WhatsApp to confirm the details of the upcoming transaction, including that the beneficiary of the transferred funds was located in

Alexandria, Virginia, within the Eastern District of Virginia. A screenshot of CS-1 and **FIGUEIRA's** conversation is depicted below:



| | Translation |
|---|---|
| | Name of Beneficiary (as registered with the bank): [Redacted] |
| | Beneficiary account number: [Redacted] |
| | Bank Address: [Redacted] Parkersburg, West Virginia |
| | Beneficiary Address: [Redacted] Alexandria, Virginia |
| | Transfer Amount. |
| Okay. Let the guys process it for you. In a few hours they will send you your receipt and put together the group for you. | |
| | Thank you Jorge. |

53.     On or about November 21, 2024, funds were sent from an FBI-controlled cryptocurrency wallet to a cryptocurrency wallet to which **FIGUEIRA** had instructed CS-1 to send money. For this Controlled Transaction #4, as well as for Controlled Transactions # 5, 6, and 7, described below, the transaction sent from the FBI-controlled cryptocurrency wallet was initiated by law enforcement personnel located in the Eastern District of Virginia.

54.     Also on or about November 21, 2024, $19,836.64 arrived in the same FBI-controlled bank account that CS-1 had previously provided to the co-conspirators. This amount that arrived in the FBI-controlled bank account is approximately consistent with the amount that **FIGUEIRA** said he would send CS-1, namely, $19,800. The transfer that arrived in the FBI-controlled bank account was sent from **COMPANY C**. The investigation revealed that **COMPANY C** is owned and operated by **FIGUEIRA**. As described above, **FIGUEIRA** discussed **COMPANY C** with CS-1. A screenshot of the confirmation of the transaction is depicted below.



*Controlled Transaction #5: January 17, 2025*
*$20,000 Transferred via USDT*

55.     In early January 2025, CS-1 contacted **FIGUEIRA** via WhatsApp to arrange for another cryptocurrency transaction. A screenshot of the WhatsApp conversation is depicted below:



Translation

| | |
|---|---|
| | Well no worries |
| | It was just to say hello |
| | On the 15th we'll talk to see about the transaction |
| | Hello Jorge, how are you? |
| | I hope you're okay. How's everything going? |
| | Jorge let me know so I can deposit the USDT. I've had them in my wallet for days. |
| Good day ▮ How much USDT do you have? And where do you want to send them? | |

56.     On or about January 17, 2025, CS-1, who was in Panama City, Panama, and **FIGUEIRA**, who was in Miami, Florida, agreed to conduct another transaction for $20,000 using USDT. Funds were sent from an FBI-controlled cryptocurrency wallet to a cryptocurrency wallet to which **FIGUEIRA** had instructed CS-1 to send money. A screenshot of the confirmation of the transaction is included below. The payee in the confirmation is listed at an address in Alexandria, Virginia, within the Eastern District of Virginia.



57.    On or about January 21, 2025, $19,839.56 arrived in the same FBI-controlled bank account that CS-1 had previously provided to the co-conspirators. It appears that the total commission was less than 1%. This commission is also consistent with the terms agreed upon by CS-1 and **FIGUEIRA**. The transfer that arrived in the FBI-controlled bank account was sent from **COMPANY A**, which is owned and operated by **FIGUEIRA**.



*CS-1 and **FIGUEIRA** Meet in Person in Miami, Florida: February 2025*

58.    On or about February 6, 2025, CS-1 and **FIGUEIRA** met in person at **FIGUEIRA**'s office associated with **COMPANY A**, in Sunny Isles Beach, Florida.  During the in-person meeting, CS-1 and **FIGUEIRA** discussed their work.

59.    **FIGUEIRA** explained that UCC-3 is an associate who brings business to **FIGUEIRA**. CS-1 stated that he was also now an associate of **FIGUEIRA**, and **FIGUEIRA** agreed.

60.    CS-1 stated: "I work with Mexicans and Colombians that send the merchandise from the south. Do you understand me? I can't play with this, Jorge. Do you understand me?" **FIGUEIRA** replied: "Perfectly. From the beginning." Based on my training and experience, I know that, in this context, "merchandise" is a reference to illicit narcotics coming from Central and South America.

61.    **FIGUEIRA** explained that he works as a money intermediary, and his business consists of charging a commission. **FIGUEIRA** stated that he tells U.S. financial institutions that his company is a trade finance consulting company; **FIGUEIRA** further acknowledged that he cannot tell U.S. financial institutions that he is a money transmitter.

62.    Later in the conversation, **FIGUEIRA** stated: "I don't like to expose myself." CS-1 stated: "We are the same. I don't like to expose myself either. I am talking about some things here that I don't tell anyone. I feel that I need to tell you about it because…" **FIGUEIRA** interrupted: "Because we know what we are talking about." CS-1 responded: "Exactly." **FIGUEIRA** said: "And silence sometimes is more convenient."

63.    **FIGUEIRA** stated: "I am not going to receive a transfer in my account from you with origins that I don't agree with, or that could be good, but I have a doubt…. If I doubt, I am

going to say no." CS-1 responded: "I am talking with you and I am telling you exactly how my business is." **FIGUEIRA** then stated: "I know. Because the same thing happens in Venezuela, where I told you that it comes from businesses that are legit, or it can come from other businesses. Sometimes I don't know."

64.     **FIGUIERA** continued: "In Venezuela, three interesting things happen. One, I receive cash that can come from the sales of refrigerators and washing machines. But at the same time the cash can come from oil sales. And it is forbidden that an American company do it with Venezuela because there could be sanctions. But three – it could be from the narcotraffic also. All of that comes in the same box." **FIGUEIRA** said that he received this money personally.

65.     **FIGUEIRA** continued: "Thinking that what I am doing in Venezuela doesn't contain that is stupid. Of course it contains a part of that. Do you understand me?" CS-1 responded: "Of course." **FIGUEIRA** continued: "What happens in Venezuela, as well as Cúcuta, that has been mixed up for a while. You don't know what is the percentage that comes from the sales of that product and what part comes from the rest of commerce. Do you understand me? Because that is all mixed." As stated above, based on my training and experience, I know that individuals engaged in organized criminal activity, such as money launderers and / or drug traffickers, often use coded terms such as "product" to refer to their illegal activities in an attempt to avoid law enforcement detection.

66.     **FIGUEIRA** further explained that he sends USDT to liquidity providers, which exchange the USDT for dollars and then send the dollars to **FIGUERA**'s accounts. **FIGUEIRA** provided an example: "Let's give you an example. A man receives some cash. I already know what the origin is. That man exchanges that cash for USDTs. The wallets can be traced. I know how to trace them. But since I know how to trace them, we know how to disguise them." **FIGUEIRA**

28

continued: "We clean that wallet. The one I received from him. Those USDTs are going to transit through seven more wallets. From one network to another before it arrives to our macro-wallet." **FIGUEIRA** then explained that from that "macro-wallet," **FIGUEIRA** sends the money to a liquidity provider, which exchanges the USDTs for dollars, and transfers the dollars to **FIGUEIRA**'s bank accounts.

67.    **FIGUEIRA** stated: "There is something that I recognize from the feds here [in the United States]. They're always looking. I'm going to be careful, and the lawyers are for that."

68.    When discussing the business address in Florida associated with **COMPANY A**, **FIGUEIRA** explained that there was no business actually conducted at that address. Rather, most of his work was done in Venezuela. **FIGUEIRA** stated: "I don't have personnel here entering operations or entering data in the computers, receiving money, nothing." **FIGUEIRA** stated that if the FBI had a search warrant at the office location, the FBI would find "A Twinkie and a bag of popcorn. That's it." **FIGUEIRA** further explained: "I don't have a business card. We created some webpages because it is mandatory for the banks here."  Based on my training, experience, and knowledge of this investigation, I understand that **COMPANY A** is a shell company – that is, a company with no significant assets or operations, designed to conceal illicit activity.

69.    **FIGUEIRA** then suggested to CS-1 that the two use coded language so that **FIGUEIRA** would understand the origin of the money provided by CS-1. **FIGUEIRA** said: "You can tell me, 'Look this is from a commercial operation at the port.' It's yours. Or you tell me, 'This one is from my customers.' Then I know the difference between one or the other. Do you understand me?" CS-1 responded: "Ok, so we can use a password." **FIGUEIRA** then said: "A password. 'Hey, pass that through here, buddy. Turn around this USDT five times more.' Later you can tell me, 'This is from my wallet.' So then I know that is your money that comes from

commercial stuff, and doesn't come from there." Again, based on my training, experience, and knowledge of the investigation, I understand that **FIGUEIRA** used coded language to avoid detection by law enforcement.

70.    **FIGUEIRA** then suggested: "They could be colors. Green and white. White is that one – you already know. And green is your stuff." CS-1 responded: "White for the white one." Based on my training, experience, and knowledge of the investigation, I understand that CS-1's comment "the white one" is a quip referencing money obtained from the trafficking of cocaine. **FIGUEIRA** continued: "When it's white, it goes out. That doesn't go through the United States."

71.    **FIGUEIRA** then said: "Do you know who has excellent technology tools to do money laundering? The Chinese. But we do, too. I spend money on monitoring, and I have supervision and control tools. I'm not going to lie. Around $35,000 monthly, only on tools."

72.    A few weeks later, on or about February 20, 2025, CS-1 had a short phone conversation with **FIGUEIRA**. CS-1 explained that he was traveling in the Washington, D.C. area and was collecting funds from people in Virginia. CS-1 stated that this money was "white," and that CS-1 was ready to conduct another transaction with **FIGUEIRA**.

*Controlled Transaction #6: February 21, 2025*
*$50,000 Transferred via USDT*

73.    The next day, on or about February 21, 2025, CS-1, who was in Panama City, Panama, contacted a group conversation on WhatsApp that **FIGUEIRA** shared with CS-1. CS-1 and **FIGUEIRA** had agreed to conduct a transfer for $50,000 using USDT. CS-1 filled out a form with the details of the requested transfer, including that the beneficiary of the transferred funds was located in Alexandria, Virginia, within the Eastern District of Virginia. Funds were sent from an FBI-controlled cryptocurrency wallet to a cryptocurrency wallet to which **FIGUEIRA** had instructed CS-1 to send money.



Translation

|  | Beneficiary account number: [Redacted]<br><br>Bank Address: [Redacted] Parkersburg, West Virginia<br><br>Beneficiary Address: [Redacted] Alexandria, Virginia<br><br>Transfer amount |
|---|---|
| Thank you, as soon as we have the debit, we will send it to you. | |
|  | Thank you. |

74.     On or about February 21, 2025, $49,605.23 arrived in the same FBI-controlled bank account that CS-1 had previously provided to the co-conspirators. Again, it appears that the total commission was less than 1%, which, based on my training and experience, I understand to be consistent with typical cryptocurrency transactions. This commission is also consistent with the terms agreed upon by CS-1 and **FIGUEIRA**. The transfer that arrived in the FBI-controlled bank account was sent from **COMPANY A**. As described above, this entity is owned and operated by **FIGUEIRA**. A screenshot of the confirmation of the transaction is depicted below. The payee of the transaction was again listed at an address in Alexandria, Virginia, within the Eastern District of Virginia.



*CS-1, CS-3 and **FIGUEIRA** Speak by Phone: June 2025*

75.    On or about June 6, 2025, CS-1 and CS-3 spoke to **FIGUEIRA** by phone. During the phone conversation, CS-3 was located in Manassas, Virginia, within the Eastern District of Virginia.

76.    CS-1 introduced CS-3 to **FIGUEIRA**. CS-1 stated that CS-1 and CS-3 work together with "the white and the green," referring to both money coming from drug trafficking and money coming from legal activities. CS-3 spoke to **FIGUEIRA** and stated that CS-3 was currently in Virginia and often picks up in the Alexandria, Virginia area.  **FIGUEIRA** stated that he was familiar with the area.

77.    CS-3 said CS-3's business was going well. CS-3 said that CS-3 would travel to the Miami area soon and would like to meet with **FIGUEIRA** and start working with him. **FIGUEIRA** agreed to meet with CS-3 and said they should move forward working together.

78. CS-3 asked **FIGUEIRA** how business was going. **FIGUEIRA** said business was stable and that his business was growing in numerous countries. Based on my training, experience, and knowledge of this investigation, I understand these statements from **FIGUEIRA** to mean that **FIGUEIRA** remains engaged in laundering money and is in fact continuing to grow his operations.

*Controlled Transaction #7: November 7, 2025*
*$100,000 Transferred via USDT*

79. On or about November 7, 2025, CS-1 contacted **FIGUEIRA** by a phone call via WhatsApp. CS-1 told **FIGUEIRA** that CS-1 had a transaction of $100,000 that CS-1 needed to make immediately. CS-1 stated that the money "is from the sale of… it's from the white one." **FIGUEIRA** confirmed that CS-1 would send USDTs, and that CS-1 wanted to receive dollars in CS-1's bank account in the United States.

80. **FIGUEIRA** told CS-1 that **FIGUEIRA** would put CS-1 in contact with UCC-4, whom **FIGUEIRA** referred to as his "bookkeeper" who "handles all the operations." **FIGUEIRA** told CS-1 that UCC-4 would be in contact via WhatsApp. **FIGUEIRA** stated that the current fee was about 1%, and that UCC-4 is the individual who handles the fees.

81. At the conclusion of the call, CS-1 stated: "That's why I like to work with you. Because, like you told me that time, not the FBI nor the DEA… Did you hear me? Just like that." **FIGUEIRA** laughed and responded: "They can go bother somewhere else. Not here. There is nothing here to bother." CS-1 stated: "That's why I like to work with you, because it's safe." **FIGUEIRA** replied: "I will send it shortly, buddy."

82. UCC-4 then contacted CS-1 via WhatsApp. A screenshot of the WhatsApp conversation is depicted below.



Translation:

| | |
|---|---|
| | I sent you 20 |
| | Review please |
| | And if you receive it, then let me know so I can send it to you 99,980.00. |
| Received 20 | |
| You can proceed with the remaining | |
| | Ok |
| | Goes |
| Received 100,025.40 | |
| Total received 100,045.40 | |
| 99,004.95 would be the amount available to make the transfer | |
| | Perfect |
| | Send me the TR receipt please |

83.    Later that day, $99,044.94 arrived in the same FBI-controlled bank account that CS-1 had previously provided to the co-conspirators. Again, it appears that the total commission was approximately 1%, which, based on my training and experience, I understand to be consistent with typical cryptocurrency transactions. This commission is also consistent with the terms agreed upon by CS-1 and **FIGUEIRA**. The transfer that arrived in the FBI-controlled bank account was sent from an entity owned and operated by **FIGUEIRA** (hereinafter "**COMPANY D**"). A

screenshot of the confirmation of the transaction is depicted below. The payee of the transaction was against listed at an address in Alexandria, Virginia, within the Eastern District of Virginia.



### *FIGUEIRA Finances*

84.    The investigation has revealed that at least four entities are owned and operated by **FIGUEIRA**, namely: **COMPANY A**, **COMPANY B**, **COMPANY C**, and **COMPANY D**.

85.    I have reviewed records from financial institutions related to these four entities. The records show millions of dollars moving through **FIGUEIRA's** accounts in a pattern the appears consistent with money laundering. Large amounts of money appear to come into and out of **FIGUEIRA's** accounts rapidly, often coming from or going to entities that appear to be shell companies. Furthermore, there do not appear to be any legitimate business expenses accounted for in the transactions, such as employee payrolls.

86.    For example, between approximately July 2023 and July 2025, funds totaling more than $2.8 billion moved through **FIGUEIRA's** various financial accounts. The majority of the inbound funds were received from cryptocurrency trading platforms. The majority of outbound

funds were sent to various businesses and individuals located in the United States and overseas, including high risk jurisdictions such as Colombia, China, Panama, and Mexico.

87.     Based on analysis of these financial records, **FIGUEIRA's** prior statements regarding the nature of his businesses, and my training and experience, I believe that **FIGUEIRA's** companies are shell companies used to launder enormous quantities of money.

### *Cryptocurrency Blockchain Analysis and Tracing*

88.     Law enforcement utilized blockchain analysis to trace the cryptocurrency involved in the Controlled Transactions # 4, 5, 6, and 7 (described above); identify cryptocurrency addresses and/or accounts involved in the movement of the cryptocurrency sent from FBI-controlled wallet(s); and analyze the patterns of the movement.

89.     In this investigation, **FIGUEIRA** and his associates provided CS-1 with a total of three different cryptocurrency wallets to which CS-1 was instructed to send money.  Controlled Transaction # 4 was sent to a cryptocurrency address beginning in "TGaP"; Controlled Transactions # 5 and 6 were sent to a cryptocurrency address beginning "TVP1"; and Controlled Transaction # 7 was sent to a cryptocurrency address beginning "TYHn." Each of these cryptocurrency addresses is on the Tron blockchain.

90.     In my training and experience, I know that the Tron blockchain is a blockchain that is commonly used by individuals involved in money laundering.  As compared to other common blockchains such as Bitcoin and Ethereum, the Tron blockchain has comparably stable and lower transaction fees associated with transactions.

91.     A transaction fee is a fee paid by the party sending virtual currency on a blockchain. On the Tron blockchain, transaction fees are colloquially referred to as "gas" and are paid in Tronx (TRX), the native token of the Tron blockchain. These transaction fees serve as a form of remuneration for validators who maintain and secure the network. While not a perfect analogy, the

transaction fee can be thought of as a toll payment on a highway; to utilize the highway, a toll must be paid by each driver when they enter or exit the highway, and that toll is used to maintain the highway for routine usage.

92.    Although the transaction fees on the Tron blockchain are typically significantly lower than those on other blockchains, they do, nonetheless, represent real costs borne by the individual or entity in control of any given address. There is little to no purpose for a legitimate business to conduct transactions between multiple addresses in rapid succession only for the funds to be eventually deposited into a cryptocurrency exchange service or liquidity provider.  As any legitimate business would seek to avoid excessive and unnecessary payments, paying multiple transaction fees instead of one serves no purpose other than to obfuscate the origin of the funds.

93.    **FIGUEIRA** stated that he followed this methodology intended to obfuscate the origin of the funds. As described above, during the February 2025 in person meeting in Sunny Isles Beach, Florida, **FIGUEIRA** explained to CS-1 that USDT sent to **FIGUEIRA** would transit through seven wallets before arriving in a macro-wallet; **FIGUEIRA** would then send the money to a liquidity provider.

94.    The FBI traced the cryptocurrency involved in the Controlled Transactions # 4, 5, 6, and 7. The tracing revealed that – as **FIGUEIRA** described – the cryptocurrency sent to **FIGUEIRA** and his associates transferred through multiple cryptocurrency wallets before arriving in a macro-wallet; from there, the funds were sent to a liquidity provider. In all four of these controlled transactions involving cryptocurrency, the funds went through a series of four to nine transactions before being sent to one of three different liquidity providers.

95.    For Controlled Transaction # 4, a total of five cryptocurrency transactions were conducted within the course of approximately one hour and 10 minutes before the funds were ultimately sent to a liquidity provider.

96.    For Controlled Transaction # 5, a total of four cryptocurrency transactions were conducted within the course of approximately one hour and 32 minutes before the funds were ultimately sent to a liquidity provider.

97.    For Controlled Transaction # 6, a total of nine cryptocurrency transactions were conducted within the course of approximately 22 minutes before the funds were ultimately sent to a liquidity provider.

98.    For Controlled Transactions # 4, 5, and 6 – all of which were conducted directly with **FIGUEIRA** – one of the final cryptocurrency transactions (just before the currency was sent to a liquidity provider) was to a cryptocurrency wallet with an address beginning "TQVA." During their in person meetings, **FIGUEIRA** mentioned to CS-1 a "macro-wallet," as well as a wallet that was likely to reach $1,000,000,000 in value. The cryptocurrency wallet beginning in TQVA is likely the cryptocurrency wallet to which **FIGUEIRA** referred (hereinafter the "MACRO-WALLET").

99.    The MACRO-WALLET was created on or about April 15, 2024. Since that date, the MACRO-WALLET has conducted a total of approximately 6,153 USDT transactions, consisting of approximately 3,379 deposits and 2,774 withdrawals. In total, the MACRO-WALLET has received approximately 1,056,755,688.677986 USDT and sent approximately 1,056,755,688.677986. The MACRO-WALLET has rarely maintained a significant balance.

100.    Controlled Transaction # 7 was sent to a cryptocurrency address provided by UCC-3 beginning TYHn and followed a slightly different pattern. For this transaction, the

cryptocurrency remained in the TYHn wallet for approximately three days, during which time additional, unrelated funds were added to the wallet, before one larger withdrawal was made. About two hours after the withdrawals, approximately 5,000 USDT was sent to an account associated with UCC-3. This transaction did not go through the MACRO-WALLET.

101.    In my training and experience, and based upon the analysis of the cryptocurrency transactions described above, there is no legitimate business purpose for the speed, structure, and layering of these transactions. This, coupled with the methods described by **FIGUEIRA**, is indicative that these cryptocurrency transactions are consistent with attempts to launder funds.

### *CONCLUSION*

102.    Based on the foregoing, I submit that probable cause exists to believe that from at least January 2024 up to and including November 2025, in the Eastern District of Virginia and elsewhere, **FIGUEIRA** conspired with others known and unknown to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) (Conspiracy to Launder Monetary Instruments), and conducted financial transactions to conceal or disguise the nature, location, source, ownership, or control of property represented to be the proceeds of specified unlawful activity, in violation of 1956(a)(1)(B)(i) (Concealment Money Laundering) and 1956(a)(3)(B) (Sting Money Laundering).

Respectfully submitted,

*Stephen A. Walker*
Stephen A. Walker
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 by telephone on December 23, 2025.

Lindsey R Vaala    Digitally signed by Lindsey R Vaala
Date: 2025.12.23 10:47:44 -05'00'

The Honorable Lindsey R. Vaala
United States Magistrate Judge

39